721 A.2d 302 (1998)
317 N.J. Super. 72
Mary Jane ROE a minor, a fictitious name, by her mother and natural guardian M.J., Plaintiff-Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC. and John Doe and Richard Roe (said name being fictitious), Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1998.
Decided December 24, 1998.
*303 George W. Conk, South Orange, for plaintiff-appellant (Tulipan & Conk attorneys; Mr. Conk, on the brief).
Elizabeth A. Kenny, Deputy Attorney General, for defendant-respondent (Peter Verniero, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Kenny, on the brief).
Before Judges PRESSLER, KLEINER and STEINBERG.
The opinion of the court was delivered by STEINBERG, J.A.D.
Plaintiff Mary Jane Roe (a fictitious name) by her mother and natural guardian M.J. appeals from the grant of summary judgment in favor of defendant New Jersey Transit Rail Operations, Inc. (NJ Transit) and from the subsequent denial of her motion for reconsideration. We agree with plaintiff that there were genuine factual issues that precluded the grant of summary judgment and that Kuzmicz v. Ivy Hill Apartments, Inc., 147 N.J. 510, 688 A.2d 1018 (1997) which was relied upon by the motion judge, is distinguishable on its facts from those here alleged. Accordingly, we reverse.
Since this is an appeal from the grant of summary judgment, we review the evidence on the motion in the light most favorable to plaintiff, the non-moving party. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995). According to that evidence, on August 6, 1994, plaintiff, then twelve years old, was sexually assaulted by an unknown assailant. Plaintiff had been walking behind her sisters from her home to a public swimming pool. The route they took, a common route to the pool, crossed the north end of the Orange Street City Subway Station located at a grade level crossing of the Newark City Subway. The station is owned by the City of Newark, but is leased to NJ Transit. Inbound trolley cars stop on the south side of Orange Street and outbound trolley cars stop on the north side of Orange Street. An overpass for Interstate 280 (I-280) passes over the outbound side of the platform. Passengers using the trains wait on a wooden platform at the station where the cars stop to pick up and discharge passengers. A mile-long fence along the tracks, erected by NJ Transit on railroad property, separates the station from the *304 adjacent Essex County park, known as Bound Brook Park. There is a gate in the fence beyond the passenger area leading into the park from the station which opens directly under the I-280 overpass. The gate, which permits access to the tracks by NJ Transit personnel, is also a commonly used entrance to the park and provides a shortcut through the park. It is undisputed that the gate and the fence are on property controlled by defendant. On the inside of the fence near the gate is a large NJ Transit sign for Orange Street.
The gate is mainly used by students who go through it to and from public school, and is also used as an entrance to the park. In his deposition, the superintendent of the Newark Subway System explained that while the gate had a latch, it had been generally left open and students from the area had been accustomed to swing on it, causing it to break. As a result, in either 1989 or 1990, the gate was bolted permanently open to prevent them from swinging on the gate and damaging it. The gate had not been bolted closed because it had been open for years and was known to provide access to the park. Although NJ Transit contends that the gate is not used by its passengers, the superintendent of the subway system conceded in his deposition the possibility that NJ Transit passengers use it for access to the station.
On the day on which the events here involved occurred, plaintiff exited the station intending to go through the gate into the park to swim in the park's swimming pool. She was apparently observed by a man sitting on the bridge embankment under the overpass. He ran toward plaintiff, confronted her, and dragged her behind thick vegetation growing next to the fence separating the station from the park. The assailant, through the use of force, brutally and repeatedly raped her. He then fled and plaintiff was able to run through the park to the pool where she found her older sisters. She told them what had happened, the police were summoned, and plaintiff was taken to the hospital. The assailant was never apprehended.
Plaintiffs filed suit against NJ Transit generally alleging its negligence by having bolted the gate open allowing it to become a commonly used means of ingress and egress to the Orange Street Station in an area that NJ Transit knew or should have known was an area of numerous assaults and other crimes. Although not couched in these terms, the gravamen of plaintiffs' complaint was that she was injured due to a dangerous condition of NJ Transit property.
NJ Transit moved for summary judgment dismissing the complaint, contending that as a matter of law, it had no liability for acts that had taken place off its property but rather on the adjacent park property belonging to Essex County. In opposition to the motion, plaintiff relied on the deposition of the subway superintendent as well as the deposition of three members of the Essex County police Department and a West Orange police officer. The police depositions attested to the general knowledge that the open gate was a commonly used entrance from the subway station to the park and that the area under I-280 next to the subway station, which had to be traversed in order to use the gate, was dangerous because of its inadequate lighting and seclusion. In fact many crimes, including homicide, robberies, muggings and sexual assaults had taken place there with the assailants making their escape through the park. Finally, plaintiff submitted NJ Transit's answers to interrogatories which explained that the fence had originally been erected, with the gate, because of reports that children had been walking on the tracks to reach the park to which there was no direct access from that location.
The motion judge concluded that, as a matter of law, the Tort Claims Act N.J.S.A. 59:1-1 to 12-3; and particularly N.J.S.A. 59:4-2 (dangerous condition of public property) did not impose liability upon NJ Transit since the incident took place in the county park rather than on property owned by it. The judge relied on Kuzmicz, supra, in holding that NJ Transit had no duty to protect plaintiff from criminal assault on adjacent property not owned by it. We conclude that the judge erroneously applied Kuzmicz to the facts here.
*305 We agree that NJ Transit is a public entity entitled to the protection of the Tort Claims Act. See Ross v. Transport of New Jersey, 114 N.J. 132, 145, 553 A.2d 12 (1989). Compare Lieberman v. Port Authority, 132 N.J. 76, 622 A.2d 1295 (1993) (Port Authority of New York and New Jersey is liable for failure of due care in protecting passengers as though it were a private corporation). We also acknowledge that under the Act, a public entity is not liable for an injury, unless liability is expressly imposed by the Act. Garrison v. Township of Middletown, 154 N.J. 282, 286, 712 A.2d 1101 (1998). We must therefore look to the Act to determine whether there is a genuine factual issue as to NJ Transit's potential liability.
N.J.S.A. 59:4-2 provides as follows:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
b. a public entity had actual or constructive notice of the dangerous condition under Section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
Public property is statutorily defined as real or personal property owned or controlled by the public entity. N.J.S.A. 59:4-1(c). Clearly the actual site of the assault here was not property owned by NJ Transit. But that fact is not the end of the matter.
Plaintiff's complaint alleges not only a dangerous condition of property controlled by NJ Transit but also a dangerous condition of property it owned, namely, the fence and gate. Viewing the contentions of plaintiff in the light most favorable to her, we are satisfied that a jury could conclude that that property was in a dangerous condition at the time of her injury; that her injury was proximately caused by the dangerous condition; that the dangerous condition created a reasonably foreseeable risk of the kind of injury incurred; and that a negligent or wrongful act or omission of an employee of NJ Transit acting within the scope of his employment created the dangerous condition. A jury could also find that NJ Transit had actual or constructive notice of the dangerous condition within the meaning of N.J.S.A. 59:4-3 sufficiently prior to the injury to have taken measures to protect against it. Furthermore, a jury could reasonably conclude that the failure of NJ Transit to protect against that foreseeable risk was palpably unreasonable. See N.J.S.A. 59:4-2.
NJ Transit does not challenge plaintiff's contention that it erected the fence on its property or permitted it to be erected. It certainly was aware of the gate's location under the I-280 overpass. Moreover, and notwithstanding the fact that the gate opens into the path directly under I-280, NJ Transit made the conscious decision to weld the gate permanently open rather than permanently closed. There was also ample evidence for a jury to conclude that NJ Transit was aware or should have been aware of the fact that the gate, which was permanently bolted open, led passersby into what could be considered the most dangerous park area under I-280, thus constituting a trap for passengers and other persons traversing the path. There was, as well, evidence from which it could be inferred that NJ Transit enjoyed an incidental benefit in bolting the door open rather than closed since it facilitated entrance into its station by potential trolley passengers but, at the same time, increased their risk of harm. Indeed, the bolting open of the gate could be construed by the finder of fact as an invitation by NJ Transit to the public to venture into a dangerous area. The fence and gate were the property of NJ Transit and were located on property controlled by it. Accordingly, there was a jury question as to whether NJ Transit's *306 property, as defined by the Act, was in a dangerous condition at the time of the injury proximately causing plaintiff's injury and whether its actions in maintaining the property in that condition were palpably unreasonable.
NJ Transit correctly argues that the term "dangerous condition" refers to physical conditions of the property itself and not to activities conducted on the property. See Levin v. County of Salem, 133 N.J. 35, 44-45, 626 A.2d 1091 (1993) (diving from a low bridge into shallow water did not render the property in a "dangerous condition" nor does dangerous activities of persons on public property, even if reasonably foreseeable, establish a "dangerous condition" of the property itself.) See also Sharra v. City of Atlantic City, 199 N.J.Super. 535, 540-41, 489 A.2d 1252 (App. Div.1985) (the act of a bicyclist in racing towards another bicyclist and striking him did not render public property in a "dangerous condition"); Rodriguez v. NJ Sports & Exposition Authority, 193 N.J.Super. 39, 43-44, 472 A.2d 146 (App.Div.1983), certif. denied, 96 N.J. 291, 475 A.2d 586 (1984) (attack by persons in a sports complex does not render the property in a "dangerous condition"); Cogsville v. Trenton, 159 N.J.Super. 71, 386 A.2d 1362 (App.Div.1978) (dog bites from a "dangerous dog" owned by a tenant in a city dwelling is not a "dangerous condition"); Setrin v. Glassboro State College, 136 N.J.Super. 329, 346 A.2d 102 (App.Div.1975) (attack on campus of State College does not render the property in a "dangerous condition"). These cases are inapposite since they involved injuries caused not by the condition of the property but by the acts of the injured party himself or the dangerous activities of other persons. Thus, in those cases, the property itself did not contribute in any way to the causing of the injuries. The injuries merely happened to occur on public property. Here, plaintiff alleges that the dangerous condition of the property itself enhanced her exposure to the criminal attack.
It is well-settled that a dangerous condition of property may be found to exist when an unreasonable risk of harm is created by the combination of a defect in the property itself and the acts of third parties. See Saldana v. DiMedio, 275 N.J.Super. 488, 499, 646 A.2d 522 (App.Div.1994), Daniel v. State, Dept. of Transp., 239 N.J.Super. 563, 589, 571 A.2d 1329 (App.Div.), certif. denied, 122 N.J. 325, 585 A.2d 343 (1990). Thus, NJ Transit may be held liable if it created a dangerous condition on its property that enhanced the risk of assault to persons crossing through its property even though the assault takes place on adjoining property provided, of course, that NJ Transit was aware of, or should have been aware of, the enhanced risk. We recognize the utility of the gate to NJ Transit as a means of access to the tracks for its authorized personnel. But the gate could have been kept locked and its personnel provided with keys or the gate could have been relocated away from the dangerous I-280 overpass. By bolting the gate open and thereby inviting the public to use it, NJ Transit substantially and knowingly increased the risk that persons accepting the invitation would encounter the dangers lurking just beyond the gate.
Finally, we must consider whether, as the trial judge concluded, Kuzmicz, supra, requires a different result. There, plaintiff, a tenant of defendant Ivy Hill Park Apartments, Inc. (Ivy Hill) was assaulted on a vacant lot owned by the Newark Board of Education (Board). The lot was located between the apartment complex and a grocery store. A seven-acre vacant lot owned by the Board was adjacent to the apartment complex. The lot was strewn with debris and overgrown with brush and trees. It was also known to be the scene of occasional drug activity and other criminal conduct. Ivy Hill had built an eight-foot-high chain-link fence to separate its property from the lot. Over the course of several years, Ivy Hill had repaired the fence three or four times. In addition, in 1987, the Board repaired the fence. A lighted sidewalk ran from the shopping plaza to the apartment complex. However, there was also a shortcut to the apartment complex by way of a winding path through the unlighted and wooded lot. By cutting across the lot, tenants could reduce the walking time from the plaza to the complex by three to six minutes. In order to gain access to the path from the complex, unknown persons had cut an opening in the *307 fence wide enough for two people to walk through it side-by-side. On the night in question Kuzmicz and a friend were returning from the shopping plaza to Kuzmicz's apartment. They used the shortcut through the lot and Kuzmicz was assaulted by an unknown assailant. The Supreme Court in a four-three decision, held that Ivy Hill did not owe Kuzmicz a duty to protect him by warning him of the risk of off-premises criminal assaults or by making more extensive efforts to seal the fence.
We are satisfied that Kuzmicz is not apposite here. In Kuzmicz, Ivy Hill had provided its tenants with a safe exit to the public sidewalks of Newark and took steps to prevent tenants from entering into the dangerous vacant adjacent lot. The Kuzmicz Court thus concluded that "[t]o impose a duty on a landlord for the safety of tenants while on property over which the landlord has no control and from which it derives no benefit would be unprecedented." Id. at 523, 688 A.2d 1018. The facts here are entirely different. NJ Transit extended an invitation to the public to enter the path under the I-280 overpass by permanently bolting open the gate at that location. It potentially derived an incidental benefit by providing or encouraging additional access to the station. Moreover, NJ Transit had control over the property which constituted the dangerous condition; it owned the fence and the gate, and they were on its property.
In Kuzmicz the acts of the landlord in erecting the fence were designed to prohibit or frustrate the use of the shortcut. Here, the acts of NJ Transit in locating the gate where it did and later in bolting it permanently open encouraged use of the short cut, creating a funnel into an extremely dangerous area. Unlike Kuzmicz, the acts of NJ Transit were designed to promote and facilitate rather than frustrate access to the shortcut. That, of course, is the critical difference between this case and Kuzmicz. In Kuzmicz the dangerous condition was the vacant lot adjacent to the owner's property that the owner had attempted to protect against by the construction of the fence. Here the dangerous condition was the owner's bolted-open gate, which invited the public to traverse the perilous foot path under the I-280 overpass, thereby substantially enhancing the public's risk of harm.
We do not hold that a public entity is obliged to take steps to make adjacent property which it does not own or control safe from criminal attack by others. We hold only that on this record, when viewing the evidence in the light most favorable to the plaintiff, a jury could reasonably conclude that plaintiff was injured due to a dangerous condition of the fence and gate owned or controlled by NJ Transit, that is, the bolting open of the gate, thus inviting the public to traverse a known dangerous area. Finally, a jury could conclude that the actions NJ Transit took were palpably unreasonable in view of the relatively minor expense and inconvenience of either relocating the gate or keeping it locked and providing authorized personnel with keys.
Reversed and remanded for further proceedings.